[Cite as *State v. Smith*, 2017-Ohio-5762.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals Nos. L-16-1113
                                                                                L-16-1114
          Appellee                                                              L-16-1115

v.                                                     Trial Court Nos. CR0201502154
                                                                        CR0201502558
Darnell A. Smith                                                        CR0201601716

          Appellant                                    **DECISION AND JUDGMENT**

                                                       Decided:  July 7, 2017

                               * * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Claudia A. Ford, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

                               * * * * *

**MAYLE, J.**

{¶ 1} Defendant-appellant, Darnell Smith, appeals the May 24, 2016 judgments of

the Lucas County Court of Common Pleas sentencing him for convictions of burglary

and receiving stolen property.  For the reasons that follow, we affirm.

## I.  Background

{¶ 2} Smith's consolidated appeal arises from his convictions in two separate cases.[1]

{¶ 3} On July 16, 2015, Smith and Darian Utley, his codefendant and brother, were indicted on burglary and receiving stolen property charges in case No. CR0201502154.  Smith was charged with one count of burglary in violation of R.C. 2911.12(A)(2), a second-degree felony, and one count of receiving stolen property in violation of R.C. 2913.51(A), a fifth-degree felony.

{¶ 4} On September 18, 2015, the grand jury issued a second indictment of Smith and Utley, along with a third codefendant, in case No. CR0201502558.  Smith was charged with two counts of receiving stolen property in violation of R.C. 2913.51(A), one a fifth-degree felony and one a first-degree misdemeanor.

{¶ 5} The two cases were tried to a jury from April 25 to 27, 2016.  The jury convicted Smith in case No. CR0201502154 of burglary as charged and a lesser degree of receiving stolen property.  It convicted him in case No. CR0201502558 of both counts of receiving stolen property as charged.

---

[1] Smith was charged in a third case, No. CR0201601716, with two counts of failure to appear for the trial of these two cases.  Smith entered a plea under *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162, on Count 1, and the state entered a nolle prosequi on Count 2.  Smith does not assign any error related to case No. CR00201601716.

2.

**{¶ 6}** On May 18, 2016, the trial court sentenced Smith to two years in prison on the burglary charge, 10 months on the felony receiving stolen property charge, and 180 days on each of the misdemeanor receiving stolen property charges. The court ordered all sentences to be served concurrently for a total sentence of two years.

## A. Facts

**{¶ 7}** In the summer of 2015, Detective Brian Lewandowski of the Toledo Police Department ("TPD") Investigative Services Bureau, Property Unit, investigated a string of burglaries in Toledo. The TPD crime analysis unit—which analyzes crime scene data for patterns in location and property stolen—notified Detective Lewandowski of a series of similar burglaries in west Toledo near the Michigan border, in the area of Secor Road and Alexis Road. All of the burglaries occurred between 6:30 a.m. and 5:00 p.m., and the victims reported that they were missing jewelry, small electronics (such as laptops and iPads), and small handguns.

**{¶ 8}** On July 1, 2015, police pulled over a suspicious vehicle in one of the frequently-burglarized neighborhoods. It was a burgundy SUV driven by Utley, who was alone in the vehicle. Officers impounded the SUV because Utley did not have a license and could not drive the vehicle from the scene. Detective Lewandowski suspected that Utley was somehow involved in the string of burglaries because officers had previously recovered an item containing Utley's DNA at one of the burglary scenes. So the next day Detective Lewandowski obtained and executed a search warrant on the SUV. He recovered gloves, a black ski mask, a black hoodie, a black backpack, glass cleaner, tape,

3.

and a bag of old and new coins. The warrant also permitted him to place a GPS tracking unit on the SUV to record the vehicle's whereabouts for up to 45 days.

{¶ 9} During his testimony, Detective Lewandowski explained that jewelry buyers and pawnbrokers play an important role in TPD's property crime investigations. Pawnbrokers and jewelry buyers are required by law to track their purchases, and law enforcement officers have access to an online database where local buyers aggregate information on their purchases. According to Detective Lewandowski, 88 area dealers use the system to track the property they purchase and the identities of the sellers. When a dealer makes a purchase, it enters certain details regarding the transaction into the online system. Officers can then access the system and compare items in the database to those reported stolen or search for sellers by name. TPD looks for possible burglary suspects by searching the dealers' lists for frequently-appearing names.

{¶ 10} John Brebberman, a customer service representative at Toledo Coin Exchange, and Myles Szymanski, the manager at Estate Jewelers, testified to their businesses' purchasing processes and their interactions with Smith.

{¶ 11} Mr. Brebberman testified that Toledo Coin Exchange is in the business of buying precious metals, jewelry, and collectible coins. For each sale, a customer service representative fills out a purchase order listing the proffered items by type of coin or carat weight, and then calculates a sale price. If the parties agree on the price, the seller must present a state-issued ID before Toledo Coin Exchange will conduct the sale. The customer service representative copies the seller's ID and attaches it to the purchase

4.

order, and then gives the seller a check for the purchase price. Mr. Brebberman testified that Toledo Coin Exchange will not buy jewelry that a customer service representative believes is stolen, but the store does not have a formal system for determining whether items are stolen.

{¶ 12} Mr. Brebberman also testified regarding two purchases that Toledo Coin Exchange made from Smith. On June 25, 2015, it purchased five bracelets, 11 necklaces, and a one-gram gold bar from Smith for a total price of $2,023.34. On June 27, 2015, it purchased "smashed and destroyed" rings and earrings from Smith for a total price of $2,271.19. Mr. Brebberman claimed that it was unusual to purchase so much gold from a customer who was not a jeweler. He also claimed that damaging or defacing jewelry would be a way to prevent stolen jewelry from being identified, but then testified that jewelry frequently breaks from normal wear. On cross-examination, Mr. Brebberman testified that nothing—other than the sheer amount of jewelry—was suspicious about his transactions with Smith. Mr. Brebberman did not recall Smith being nervous or Smith's appearance being out of the ordinary. Nor did he remember Smith doing anything that made Mr. Brebberman think the property was stolen.

{¶ 13} Mr. Szymanski testified that Estate Jewelers repairs and designs jewelry, buys gold and silver, and loans on jewelry. Estate Jewelers' purchasing process is similar to Toledo Coin Exchange's process. If someone wants to sell something to Estate Jewelers, the store's buyer will give the seller an estimate. If the seller agrees to the price, the buyer fills out a detailed receipt and copies the seller's ID on the receipt.

5.

Unlike Toledo Coin Exchange, however, Mr. Szymanski testified that Estate Jewelers will buy jewelry it believes is stolen. He claimed that TPD asked Estate Jewelers to buy any items that seem suspicious so that the police are able to return them to their owners.

{¶ 14} Mr. Szymanski also testified regarding two purchases that Estate Jewelers made from Smith. On June 4, 2015, it purchased three gold chains, one ring, one bracelet, and four pairs of earrings—all broken—and a one-ounce gold bar from Smith. Estate Jewelers paid him $2,049. On July 6, 2015, it purchased one gold coin, one gold coin frame, 18 rings, eight chains or bracelets, one pendant, and one cross from Smith. Estate Jewelers paid him $1,750.

### 1. June 4, 2015 Burglary

{¶ 15} Smith's felony conviction for receiving stolen property relates to the burglary of Nancy McClosky's home on June 4, 2015. Mrs. McClosky testified that someone broke into her house while she and her husband were at work that day. Mrs. McClosky left for work around 6:00 a.m., and Mr. McClosky left around 7:30 a.m. When they left, the doors to the house were locked and the window in the spare bedroom was partially open. When Mr. McClosky returned home around 4:30 p.m., he found the house in disarray, the back door unlocked, and the window in the spare bedroom fully opened. He called Mrs. McClosky at work, who told him to call the police. Mrs. McClosky testified that drawers were rummaged through and things were scattered everywhere, all of her jewelry was missing from the spare bedroom, and some coins and a one-ounce gold bar were missing from Mr. McClosky's nightstand.

6.

{¶ 16} Officer Antonio Aguilar of the TPD testified that he responded to Mr. McClosky's call about the burglary on June 4, 2015. He arrived at the McCloskys' home around 7:00 p.m. to investigate the burglary that happened earlier that day. He testified that Mr. McClosky reported approximately ten necklaces, assorted rings and bracelets, collectible coins, and the gold bar missing from the home. The McCloskys identified the bedroom window they believed the perpetrator used to enter their home, and Officer Aguilar checked the window and area around it for possible sources of fingerprints, blood, or DNA evidence. He was unable to find any physical evidence that could identify the burglar, however. Because he had no witnesses or physical evidence that could help find the person who broke into the McCloskys' house, Officer Aguilar passed the case to the TPD detective bureau.

{¶ 17} The state admitted into evidence a picture of two bracelets and a photocopy of a gold bar with the serial number scratched off. Mrs. McClosky identified the bracelets as hers and testified that they had a total value of approximately $175. Mrs. McClosky also identified the gold bar as the one taken from her husband's nightstand, which she valued at approximately $2,000. She said the TPD called a couple of months after the burglary to have her identify and claim her bracelets, but she never recovered the gold bar. On cross-examination, Mrs. McClosky testified that the bracelets were purchased through a jewelry party and did not have any engraving or other identifying marks. She also admitted on cross-examination that the gold bar did not contain any identifying information, though it bore the same brand markings as the one she owned.

7.

{¶ 18} Mrs. McClosky testified that she did not know Smith, had never seen him before trial, and never gave him permission to be in her home or to have her jewelry.

{¶ 19} Mr. Szymanski from Estate Jewelers testified that on June 4, 2015, at 11:35 a.m., Smith sold the gold bar that Mrs. McClosky identified. He said that Estate Jewelers photocopied the gold bar because its serial number was scratched off. He said that Estate Jewelers typically holds items like the gold bar for 30 days to see if someone tries to claim it. No one attempted to claim the gold bar, so the store disposed of it.

## 2. June 25, 2015 Burglary

{¶ 20} Smith's misdemeanor conviction for receiving stolen property in case No. CR0201502558 arose from the burglary of Louisa Duchess's home on June 25, 2015. Ms. Duchess testified that she left her home at 8:30 a.m. for an appointment and returned at 9:05 a.m. She noticed items out of place when she entered the kitchen. She then looked into the dining room and saw that the front door was open. She immediately left the house because she suspected someone had broken into her home and was scared that the intruder might still be there. She called 911 from her driveway.

{¶ 21} Ms. Duchess testified that TPD officers arrived about 15 minutes later and checked her home to ensure that the intruder was gone. She followed the officers while they surveyed her home and saw that her jewelry was missing, items in her bedroom and guestroom had been pulled out of drawers and thrown around, and her desk had been rifled through. She also saw that a chair was underneath her patio window, which she

8.

believed the perpetrator used to enter her home.  She testified that the burglar took earrings, necklaces, and rings, but did not take any of her electronics.

{¶ 22} After the burglary Ms. Duchess found five or six pieces of her jewelry at Toledo Coin Exchange.  She was able to buy back two of them, but she could not afford to purchase the rest.  The state admitted into evidence pictures of several pieces of jewelry, among which Ms. Duchess identified a bracelet, a ring, two necklaces, and a heart-shaped pendant as hers.  She claimed that one of the necklaces was custom-made from her mother's old watch chain.  On cross-examination, Ms. Duchess admitted that none of the jewelry she identified as hers contained any engraving or identifying marks.

{¶ 23} Ms. Duchess also testified that she did not know Smith, had never seen him before trial, and never gave him permission to be in her home or to have her jewelry.

{¶ 24} Mr. Brebberman from Toledo Coin Exchange testified that on June 25, 2015, at 12:20 p.m., Smith sold the bracelet, one necklace, and the heart-shaped pendant that Ms. Duchess identified.  He said that a few days later, on June 27, 2015, at 11:10 a.m., Smith sold the second necklace and the ring that Ms. Duchess identified.

### 3.  July 6, 2015 Burglary

{¶ 25} Smith's burglary conviction and misdemeanor conviction for receiving stolen property in case No. CR0201502154 arose from the invasion of Lisa Gilson's home on July 6, 2015.

{¶ 26} Ms. Gilson testified that she left for work that morning between 8:00 a.m. and 8:15 a.m.  She returned home between 10:00 a.m. and 11:00 a.m. to retrieve an item

9.

she needed for work. When she got home, she noticed that her laptop was sitting on her kitchen counter, which was not where she had left it, and saw soap bubbles in the sink. She did not see anything else unusual, so she left and returned to work. She remained suspicious, however, and decided to contact two people who had access to her spare house key to see if they had been in her home that morning. She learned that neither had been in the house. After discussing the situation with her coworkers, Ms. Gilson became increasingly worried that something had happened at her house. She returned home to investigate further.

{¶ 27} Ms. Gilson returned home between 12:30 p.m. and 1:00 p.m. When she got home she found her bedroom drawers rifled through, her jewelry dumped on her bed, items thrown on the floor in her bedroom and office, and dirty smudges on her kitchen cabinets. Ms. Gilson saw that a cat perch in her spare bedroom had been moved away from the window and testified that she believed the burglar came into the house by removing the screen from the open window. Some of her jewelry was missing, including her parents' wedding bands; several gold chains, necklaces, and rings; and a gold coin with a gold bezel. Ms. Gilson called 911 to report the burglary at 1:51 p.m.

{¶ 28} Detective Lewandowski responded to Ms. Gilson's house following the 911 call. He testified that Ms. Gilson was distraught because many of the missing items were family heirlooms. Detective Lewandowski checked the home for fingerprints, but he did not find any.

10.

**{¶ 29}** After he investigated the scene at Ms. Gilson's house, he searched the pawnbrokers' online property-tracking database for Smith's name and discovered that Smith had already sold items matching the descriptions of those taken from Ms. Gilson's house earlier that day to Estate Jewelers. He recalled the transaction being recorded around 1:00 p.m. or 1:30 p.m. Mr. Szymanski from Estate Jewelers later confirmed that Smith had sold various items—including some jewelry belonging to Ms. Gilson—at 1:25 p.m. on July 6.

**{¶ 30}** Detective Lewandowski testified that he went to Estate Jewelers and photographed the items it had purchased from Smith. From the pictures Ms. Gilson was able to identify two of her father's wedding rings, some gold bracelets, a gold toe ring, and the gold coin and bezel. She purchased all of the jewelry for $623. Sometime after the burglary, Detective Lewandowski asked Ms. Gilson if she was able to identify any of her jewelry among pieces that the police recovered from Utley's residence. She identified her mother's wedding band, her high school class ring, some costume jewelry, and some gold chains. On cross-examination, Ms. Gilson conceded that none of her jewelry—aside from her class ring—bore any identifying marks.

**{¶ 31}** Detective Lewandowski testified that he reviewed the GPS tracking records from Utley's SUV and connected them to the burglary at Ms. Gilson's home. The tracking records show that the SUV was in the vicinity of Ms. Gilson's house on the morning of July 6, 2015, and that it stopped moving between 9:16 a.m. and 11:02 a.m.

11.

The vehicle began moving again at 11:02 a.m. and at 11:38 a.m. arrived at the Mellwood Avenue address of Peggy Yeager, the mother of Utley's child.

{¶ 32} On July 7, 2015, TPD officers followed Utley and arrested him on the suspicion that he had committed yet another, unrelated burglary. Utley's parole officer visited him at the Mellwood address later that day and noticed large amounts of jewelry at the house. The parole officer advised Detective Lewandowski, who secured a search warrant for the house. The search yielded "150 or so plus" necklaces, "[a] lot" of bracelets, "numerous" rings, "[a] lot" of collectible coins, foreign currency, and "quite a few" small electronics. Detective Lewandowski testified that he spent two weeks contacting victims of recent burglaries—including Mrs. McClosky and Ms. Gilson—to see if they could identify any items recovered from Utley's house.

{¶ 33} Detective Lewandowski testified that he pursued the burglary charge against Smith for the July 6 break-in because of the short time between the break-in at Ms. Gilson's house and Smith selling her jewelry. He believed the jewelry sale was so close in time to the burglary that the person selling the jewelry must have been involved in the burglary. He also stated that Utley's vehicle had been in the area of Ms. Gilson's house during the timeframe when the burglary occurred, and he knew from law enforcement databases that Smith was one of Utley's known associates. Detective Lewandowski admitted on cross-examination, however, that the SUV was not registered to Smith, no one had seen Smith in the SUV, Smith did not try to claim the SUV from impound, Smith did not reside at Utley's Mellwood address, no one had seen Smith or his

12.

vehicle in Ms. Gilson's neighborhood, and no forensic evidence linked Smith to the July 6 burglary. Detective Lewandowski also testified that TPD never questioned Smith or searched his home or vehicle before filing the burglary charge.

{¶ 34} Additionally, Ms. Gilson testified that she did not know Smith and had never seen him before.

### B. Smith's Testimony

{¶ 35} Smith testified on his own behalf. He admitted to making all four of the jewelry sales to which Mr. Szymanski and Mr. Brebberman testified and admitted that some of the victims' jewelry was among the pieces he sold. But he denied knowing that the jewelry was stolen. Smith also denied any involvement in the burglary of Ms. Gilson's home.

{¶ 36} According to Smith, he completed the jewelry sales on behalf of Benjamin Yoder, who Smith knew only as "Boo Boo." Smith was acquainted with Yoder because Yoder lived in the same apartment complex as Smith's girlfriend. The men did not know each other well and were not friends. In fact, Smith knew so little of Yoder that Smith claimed he did not know that Yoder was Utley's friend until after Smith was indicted in connection with this case.

{¶ 37} Smith testified that Yoder asked him to sell jewelry on several occasions because, according to Yoder, he had open arrest warrants that prevented him from selling the jewelry himself. Smith turned down many of Yoder's requests, but agreed to sell

13.

jewelry on June 4, June 25, June 27, and July 6. After the sales, Smith gave the money he received to Yoder, who paid Smith approximately $200 for each sale.

{¶ 38} Smith testified that Yoder provided all of the jewelry. Although Smith was surprised by the amount of jewelry that Yoder gave to him, he never asked Yoder where the jewelry came from. Smith did not believe the jewelry was stolen, however. Smith reasoned, "[W]ho can come up with that much gold? Who can steal that much gold? It didn't make sense to me that it would be stolen if he keeps having it, so I don't know where to just go find gold right now so, you know, I didn't think nothing of it." Smith thought it "impossible" to steal so much jewelry without robbing a jewelry store. He also believed Yoder was a "decent guy" who "didn't seem like the type of guy that steals." When the state asked Smith on cross-examination if he had any reason to believe the jewelry was stolen, he admitted that he "should have, but at the time, no, I didn't. I didn't question it too much."

{¶ 39} Regarding the burglary of Ms. Gilson's home, Smith testified that he could not have been involved because he has back and shoulder injuries that prevent him from fully lifting his arm. He claimed that his injuries would make it impossible for him to climb in someone's window. He admitted on cross-examination that he was able to carry the jewelry to the store, but he claimed that it was not very heavy. He also admitted that his injuries would not prevent him from driving a car and acting as a lookout, but he denied ever doing so. He claimed he did not know Mrs. McClosky, Mr. McClosky, Ms.

14.

Duchess, or Ms. Gilson and had never been to any of their homes. He also claimed that he had never burglarized anyone.

{¶ 40} Smith further testified that he did not have much of a relationship with his brother because Smith disapproves of Utley's crime-filled lifestyle. He and Utley had very little interaction and saw each other only a few times a year. Smith did know, however, that Utley was on parole in the summer of 2015 for a burglary conviction from Michigan. Smith said that Utley had stolen from him several times. Smith also claimed that he did not know Ms. Yeager well, did not live at her Mellwood home, and had never been in her SUV.

{¶ 41} Smith appeals the trial court's judgment, asserting two assignments of error:

1) Appellant's conviction for Burglary was not supported by legally sufficient evidence.

2) Appellant's convictions for Burglary and Receiving Stolen Property fell against the manifest weight of the evidence.

## II.  Law and Analysis

### A.  Sufficiency of the Evidence

{¶ 42} Smith first objects to the sufficiency of the evidence supporting his burglary conviction. The state contends that it presented sufficient evidence to support the jury's finding that Smith either committed burglary or was complicit in committing

burglary because he possessed Ms. Gilson's jewelry shortly after someone broke into her home.

{¶ 43} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Were,* 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 44} Under R.C. 2911.12(A)(2), it is illegal for any person by force, stealth, or deception to trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is the habitation of any person, when a person other than an accomplice is present, with purpose to commit in the habitation any criminal offense. "'It has long been the law of this state that, where a burglary has been committed and property stolen as part of the criminal act, the fact of the subsequent possession is some indication that the possessor was the taker, and therefore the doer of the whole crime.'" *State v. Simon*, 6th Dist. Huron No. H-04-026, 2005-Ohio-3208, ¶ 14, quoting *State v. Brennan*, 85 Ohio App. 175, 177-178, 88 N.E.2d 281 (9th Dist.1949). In *Methard v. State*, 19 Ohio St. 363, 368 (1869), the Supreme Court of Ohio stated:

16.

The facts that a building was burglariously entered, goods stolen therefrom, and the possession by the accused, soon thereafter, of the goods stolen, are competent evidence to go to the jury, and, in connection with other circumstances indicative of guilt, such as giving a false account, or refusing to give any account, of the manner in which, or the means by which, he came into possession of the stolen goods, they may afford a strong presumption of fact of the guilt of the accused, and warrant the jury in finding him guilty of both the burglary and larceny. (Emphasis omitted.)

{¶ 45} Thus, under *Methard*, a jury may reasonably infer that a defendant committed theft or burglary based on the following circumstantial evidence: (1) the stolen items were found in the defendant's possession "soon thereafter" and (2) there are "other circumstances indicative of guilt"—for example, the lack of a credible explanation of how the defendant came to possess the stolen items so soon after the crime occurred.

{¶ 46} Ohio courts occasionally blend the two *Methard* elements and state, instead, that the "'unexplained possession by a defendant of recently stolen property may give rise to a permissible inference from which a jury may conclude, beyond a reasonable doubt, that the accused is guilty of the theft.'" *State v. Goodwin*, 6th Dist. Lucas No. L-12-1341, 2014-Ohio-2323, ¶ 37, quoting *State v. McAllister*, 53 Ohio App.2d 176, 180, 372 N.E.2d 1341 (8th Dist.1977); *see also State v. Brown*, 10th Dist. Franklin No. 05AP-601, 2006-Ohio-2307, ¶ 11 (same); *State v. Sechler*, 5th Dist. Fairfield No. 19-CA-76, 1977 Ohio App. LEXIS 10150, 9 (Mar. 2, 1977) ("It is well settled that the unexplained

17.

(including failure to give a reasonable explanation for) possession of recently stolen property constitutes prima facie evidence of the theft.").

{¶ 47} Regardless of how the standard is phrased, Ohio courts are consistent in their approach. That is, in Ohio, a jury may infer, beyond a reasonable doubt, that a defendant committed theft or burglary where there is both a close temporal proximity between the commission of the crime and the defendant's possession of the stolen items, and the defendant fails to provide a credible explanation for his possession of the stolen items or "other circumstances indicative of guilt" exist.

{¶ 48} Here, the record indicates that Utley's vehicle was in the vicinity of Ms. Gilson's home during the morning hours of July 6, 2015, and that it was parked between 9:16 a.m. and 11:02 a.m. Ms. Gilson testified that she returned home from work around 12:30 or 1:00 p.m. and discovered that her house had been burglarized. She called 911 to report the burglary at 1:51 p.m. By the time she made that call, Smith had already sold some of Ms. Gilson's belongings to Estate Jewelers at 1:25 p.m. We find this evidence demonstrates a very close temporal proximity—at most, a few hours—between the burglary and Smith's possession of the stolen items. Indeed, courts have found that larger gaps of time may provide sufficient circumstantial evidence of guilt. *See, e.g., Simon*, 6th Dist. Huron No. H-04-026, 2005-Ohio-3208, at ¶ 17 (finding that the defendant's possession of stolen property 30 hours after the break-in "qualifies as 'soon thereafter' pursuant to *Methard*"); *State v. Brennan*, 85 Ohio App. 175, 88 N.E.2d 281

18.

(defendant attempted to cash stolen bonds two days after the victim's home was burglarized).

{¶ 49} Given the close temporal proximity between the commission of the burglary and Smith's possession of the stolen goods, we next consider whether the record contains "other circumstances indicative of guilt" such as the lack of a credible explanation. At trial, Smith explained that Benjamin Yoder, a man who Smith barely knew and whom he knew only as "Boo Boo," gave him the goods and hired Smith to sell the goods on his behalf in exchange for $200. The jury was free to believe or discredit Smith's testimony, and we do not consider witness credibility on a sufficiency analysis. We find that Smith's testimony was sufficient evidence from which a rational trier of fact could conclude that Smith provided a false explanation for his possession of the recently-stolen property, which is akin to providing no explanation at all.

{¶ 50} Accordingly, there was sufficient evidence to permit an inference, beyond a reasonable doubt, that Smith committed the burglary of Ms. Gilson's residence, either as the principal or as an aider and abettor to Utley.[2] *See Simon* at ¶ 16 (recognizing that, where close temporal proximity exists, the defendant's "incredible explanation of possession of stolen goods" permits an inference that "the possessor broke and entered into the building which contained the goods"); *Brennan* at 182 (finding that the

---

[2] Utley entered an *Alford* plea to one count of burglary related to the July 6, 2015 break-in at Ms. Gilson's house. The trial court found him guilty and sentenced him to 24 months in prison.

defendant's "fanciful explanation of possession was such as a court or jury could reasonably conclude to be a false and untrue narration of an imaginary experience"); *State v. Griggs*, 10th Dist. Franklin No. 89AP-1417, 1990 Ohio App. LEXIS 4130, 2 (Sept. 18, 1990) (recognizing that where meat was stolen from a steakhouse and the defendant was "found soon hiding in a nearby stairwell" with the stolen meat, the defendant's "unexplained possession" of the recently-stolen property—alone—could lead the jury to reasonably conclude that the defendant committed the theft and burglary alleged); *State v. Coker*, 15 Ohio App.3d 97, 99, 472 N.E.2d 747 (9th Dist.1984) ("There was no evidence which explained the presence of the stolen property and this lack 'may give rise to a permissive inference from which a jury may conclude, beyond a reasonable doubt, that the accused is guilty of the theft.'").

{¶ 51} Moreover, although Smith argues that no reasonable jury could have found him guilty beyond a reasonable doubt because Utley's vehicle "made too many stops" and Smith therefore "could have joined Utley in the vehicle at any point" after the burglary occurred, this argument is irrelevant. The jury "may reasonably conclude that inferences drawn from the evidence more strongly support a finding of guilt rather than innocence; the trier of fact is no longer required to ascertain whether all inferences exclude all hypothesis of innocence." *Simon* at ¶ 16.

{¶ 52} Accordingly, we find Smith's first assignment of error not well-taken.

20.

## B. Manifest Weight of the Evidence

{¶ 53} In his second assignment of error, Smith contends that his convictions are against the manifest weight of the evidence.

{¶ 54} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*,* 175, 485 N.E.2d 717 (1st Dist.1983). Although under a manifest weight standard we consider the credibility of witnesses, we extend special deference to the jury's credibility determinations given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

21.

## 1. Burglary

{¶ 55} As already discussed above, the record demonstrates that the burglary of Ms. Gilson's home occurred during the morning hours of July 6, 2016, most likely between 9:16 a.m. and 11:02 a.m. while Utley's vehicle was parked in the vicinity. Ms. Gilson discovered that her home had been burglarized around 12:30 p.m. or 1:00 p.m., and she called 911 to report the burglary at 1:51 p.m. By the time of the 911 call, Smith had already sold some of Ms. Gilson's jewelry to Estate Jewelers at 1:25 p.m.

{¶ 56} Smith, however, denied any involvement in the burglary and claimed that he received Ms. Gilson's jewelry from Benjamin "Boo Boo" Yoder, a man who Smith barely knew. Smith testified that Yoder had hired Smith to sell jewelry on his behalf on several occasions, including July 6, 2015, because Yoder had open arrest warrants that prevented him from selling the items himself. Smith explained that he gave the money he received to Yoder, who paid Smith approximately $200 for making the sale.

{¶ 57} Although Smith provided an alternative explanation for his possession of recently-stolen jewelry, we simply cannot say that the jury lost its way by discrediting his testimony—especially given that Smith appeared at Estate Jewelers with Ms. Gilson's stolen jewelry within only a few hours of the burglary. This is not an exceptional case in which the evidence weighs heavily against the conviction. For these reasons, we hold that Smith's burglary conviction is not against the manifest weight of the evidence.

22.

## 2. Receiving Stolen Property

{¶ 58} Under R.C. 2913.51(A), "[n]o person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Smith argues that the state failed to prove that he knew or had reasonable cause to believe that the jewelry he sold to Toledo Coin Exchange and Estate Jewelers was stolen. We disagree.

{¶ 59} The state proved that Smith took large amounts of broken jewelry from Yoder—a man he barely knew—and sold it. He claims that he did so because Yoder's outstanding warrants prevented Yoder from selling the jewelry himself. Smith's admittedly "unlogical thinking" was that the jewelry Yoder gave him could not be stolen because Yoder "didn't seem like the type of guy that steals" and the amount of jewelry Yoder gave Smith was "too much" to possibly be stolen. Most significantly, Smith admitted that he should have known the jewelry was stolen, though he claimed that he "didn't question it too much" at the time.

{¶ 60} Considering Smith's testimony and giving special deference to the jury's determination of Smith's credibility, we cannot find that the jury lost its way and created a manifest miscarriage of justice by convicting Smith of receiving stolen property. Smith's second assignment of error is not well-taken.

23.

### III. Conclusion

**{¶ 61}** The May 24, 2016 judgments of the Lucas County Court of Common Pleas are affirmed.  Smith is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.

Thomas J. Osowik, J.

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.